I'm Arthur Cabral from the Justice Department. I represent the Commissioner in this case. Does the Commissioner lose a lot of cases? I'm sorry? I don't usually see the Commissioner in this appellant. Everyone's gone. Everyone's gone. And we might reserve three minutes. That's granted. A tax-exempt entity that is looking to renovate a historic building that it owns may legitimately leverage the benefit of the attendant rehabilitation tax credits by partnering with a tax board investor that, unlike the tax-exempt entity, can make use of those tax credits. Let's get to the heart of this, if we can. You can't sell tax credits, right? That's correct. That's your position. And your position is that, in this case, they're trying to sell them. That's correct. I did hear from the letter, was it Mr. Hoffman? Is that his name? Who said, this is the way you can do that? That's sort of the industry lingo. It's basically a tax-credit broker. It's a tax-exempt, whether tax-exempt or not. Basically, his occupation was pretty good in these fields. To bring somebody in, they would use the credits. What's the appropriate standard of review in this case? The ultimate determination of how a transaction is characterized for tax purposes is subject to de novo review. I believe that's clear from the Farms and Lining case in the Supreme Court in 1975. Isn't this a mixed question? Are there factual things going on here that need some deference? There's not a whole lot of facts. Doesn't the Colbertson case call for that? It doesn't have to be a mixed question. Doesn't Colbertson call for an analysis of certain factors that these would be mixed questions in law and fact? Yes, it does. It takes a facts and circumstances approach. I think, again, what the underlying facts are, obviously, whatever the tax court found the facts should be, are subject to deference. But the conclusion drawn from those facts, I believe, is a de novo question of law. Can I ask you about the economic substance doctrine versus the substance over form doctrine? Because I would like you to respond to something specifically from the roundtable, because this is brief. They make the assertion that the commissioner is trying to conflate these and treat something as a matter without economic substance, when what is really going on here is the elevation of form over substance, and that those two different approaches have a serious, meaningful difference. I refer you to page 5 and 7 through 9 of their amicus brief. Are they wrong? Should we be concerned that the commissioner is conflating doctrines here in a way that will lead to confusion in future cases? I don't think so, because nobody is saying that the activities of the partnership lacked economic substance. Obviously, bulldozers came in and knocked stuff down and put stuff up. But I think we're talking about what a partnership is a sham partnership. I mean, a helpful way to look at it. I'm sorry. Well, that's, I think, the point that this amicus and other folks in the case were kind of driving at, is that if you look at this as a sham partnership as opposed to a sham transaction, those are two different, distinct inquiries, and if you try to meld them together, or as I think you guys put it in your brief and had you say it, you said you were applying a variant of the economic substance doctrine. I think the economic substance doctrine disregards whatever the underlying activity is, the underlying investment activity or real estate activity. The sham partnership doctrine, all you're doing is disregarding the form of the partnership that was utilized. And I think one court has explained it as saying, you know, if you want to call it an application or a variant of the economic substance doctrine, the transaction that you're looking at is the formation of the partnership, not what the partnership went and did. Well, can I ask you a question along that line? Is the existence of a gun-to-private partnership between the parties a question of law or fact? Well, again, I think it's the question, the ultimate question of how a transaction is characterized for such purposes is a question of law. I think that comes from Frank Lyon in the Supreme Court. Now, again, the underlying factual findings of the tax court are saying that. Well, they're facts. Yes. Right. And I don't think there's a whole lot of factual dispute here. I mean, you know, it's really a question of— It's a question of stipulations. I understand, right? Yeah. It's a question of what is the legal consequences of what was done. Again, I think that's a— What's the significance of the fact that the materials used to market this transaction repeatedly describe a sale of tax credits? Well, if anything, I think it's indicative of the party's intent. Obviously, labels that a tax credit broker uses are going to govern the substantive determination. So that shouldn't have any part in our analysis is what you're saying? I'm sorry? So what Mr. Hoffman said shouldn't have any place in our analysis? Well, I think it tends to indicate what the parties were up to here. But just because he said it's a sale of tax credits doesn't make it a sale of tax credits. I think you look at what actually happened. But the fact that they repeatedly referred to this sale of tax credits, I think it does provide some insight into what was driving these people, what was motivating this transaction. I don't believe the point, but I'm not sure I yet understand the distinction. I think I understand your earlier argument. You're asserting that the partnership here is a sham, and you're saying that we should look at this by applying a test that's a variant of the sham transaction document. In other words, it looks like you've taken one from Column A, Culbertson, and one from Column B, sham transaction, and telling us to look at this as some combinations. I think you briefed it, which I don't know. Was that the theory that was argued to the tax court? Yeah, it was, and I know we cited in our reply brief, we cited the trial board documents where we expressly said the partnership was an economic sham. And so, you know, although the course of the tax court decisions might have sort of blurred the line a little bit between the two doctrines. We want to know what you are advocating to us. Are you giving us basically alternative arguments, one substance of reform and one economic substance, and pressing both? Yes, pressing both. But not separately, right? Not at all. Okay. Good. Okay, we'll take you at that. That's what I'm getting at. It looked like in the briefing, it looked like you were trying to put these things together, and my impression is, I'm sure that the amicus were upset with you for a number of reasons, but one reason that seemed to come across pretty loudly was, they're taking distinct doctrines, smushing them together, and the result is going to be some chaos in the industry that has to deal with this. Because the consequence of saying that something lacks economic substance is that you disregard the thing entirely, whereas if you're dealing with a form over substance problem, you don't disregard the entire event. You just figure out what actually happened within that event and how to properly characterize it. And those are two really big differences. I mean, those are really different results. So if what you're telling us now is you're treating them separately, the way amicus says they ought to be treated, and there are alternative arguments, that's fine. Just tell us that, and I'm off of this topic. Yeah, I think the substance over form doctrine is really more respected than our bona fide partner theory. So you do accept that these are two separate things, and there are alternative arguments you're not trying to combine with something. Correct. But I will point out that the sham partnership doctrine is not something new. You know what? I don't think they were suggesting that, and I hope I didn't suggest it in any question I was asking. Okay. But fortunately, I think this case lends itself more cleanly to the bona fide partner theory, and I think that's what we went with in our brief. It seems that the tax court didn't put as much analysis into that. That's what I read it anyway. Well, yeah, and I think in the tax court, I think we switched the order. I think we argued sham partnership first, and then bona fide partner theory. And so it's easy to, you know, once you've sort of gone through one, to sort of say, well, for the same reasons we found, you lose on one, you lose on two. But we could, for analytical purposes, and I plan to ask your opposing counsel this, for analytical purposes, it's possible, isn't it, to say, assume there's economic substance to the transaction. To the transaction or to the partnership? To the transaction. Assume there's some economic substance to the transaction. That doesn't mean that you get these credits, because the form of your participation in the transaction was not a true equity participation. The benefit of the tax credit follows the beneficial ownership of the property being renovated. So you can get to where you think this case ought to go, even assuming there's economic substance to the transaction, because you can say you were the true partner in the partnership. Right. And, I mean, I don't see anybody saying there wasn't economic substance to the underlying real estate activity. You know, again, you're knocking down walls and pouring concrete. You know, that's real activity. But it's your argument it's not a real partnership. For tax purposes, it is not yet right as an economic share. Yeah. I think we understand that. Thank you. You saved time for rebuttal. Time goes quickly in this court, doesn't it? May it please the court, my name is Kevin Flynn. I represent the Security Sports and Expedition Authority, which is the tax matters partner for the historic BoardWalk Hall. Okay. So it's your position that this was, well, do you agree that if this wasn't a real partnership, then your client is not entitled to the tax credit? Well, I fundamentally agree that this could be tax court found based on the facts. Well, but the question of the tax court is before us. Whether its finding is going to be affirmed or not is what we have before us. Under Culbertson, we think that this was a real partnership. If the court were to find that the Culbertson factors didn't apply, and there was not a bona fide partnership, which we would disagree with, of course, then I guess the logical conclusion is that the big credits wouldn't fall. Okay, now, would you take me through these facts and tell me if you think any of them, I'm going to take you through them, tell me if you think any of them are wrong. Here, the authority guaranteed the completion of the rehabilitation project, right? I think it's a, that's a accurate factor, but it has no particular legal significance on a partnership issue. Well, we can worry about that afterwards. Okay. And the authority agreed to pay any, Well, what I'm getting at is this, was there any risk? There was not any risk. Okay, well, we're going to get to that in a minute. Let me get the question out then. The authority agreed to pay any rehabilitation costs beyond estimates, right? If there was a deficit, the authority agreed to pay that, if there was a deficit. It agreed to reimburse Pitney Bowes for costs arising out of any environmental liability and obtain insurance covering such liability. That's not completely correct. No, it's not? There was an insurance policy, a $25 million insurance policy, which the partnership was the main insurer on, and if for some reason that $25 million was not sufficient, then there was indemnification by the support authority. I'm not finished going through my list. I'm sorry. The authority guaranteed the tax benefits. It did not guarantee them. It indemnified the tax benefits to the extent that they were not, that the renovations didn't occur or were not successfully completed or subject to challenge by the IRS. It protected Pitney Bowes from loss in the event the authority was unable to pay the purchase price under the put or call options. I disagree. You disagree? I disagree with that characterization. I think it all comes from the appendix. I disagree with that characterization. There was a put or call that I agree with, and there was what they call a kick that I agree with, but I think that your characterization I don't agree with. I think it's broad, and that's all I'm saying. You think what's wrong? I think it's much broader than that. That the upside potential of Pitney Bowes was much broader than the way you described the put or call. The authority agreed to fund any deficits from the operation of the East Hall by interest-free loans to HBH. I'm not saying, I'm not characterizing them. I'm just getting to the facts. That is a fact in the partnership agreement. That's correct. Okay. So that one could say, looking at this, that all risk from the transaction has effectively been taken out of play. I definitely disagree with that characterization. Okay. What was the risk? This was a real estate investment by Pitney Bowes and the sports authority. When they started construction and the rehabilitation, there was no guarantee. There wasn't a risk to Pitney Bowes. What's the realization we're trying to get at? Was it never completed? If the deficits concluded and you had identified them in that regard, that is, there's an indemnification that says if we bought and we never get it done and you don't get the tax benefit, we're on the hook for it, right? Yes, Your Honor. So where's the risk? The risk is I'll pay you if it's not finished. We're just going to say, Pitney Bowes went into this transaction hoping to complete the renovation of the hall and hoping to get the tax credits. If that did not occur, that's a risk to Pitney Bowes. Stop, stop, stop. If that didn't happen, Pitney Bowes was going to get the money equivalent of those tax credits from NGSCA, right? No, only up until that point in time. In other words, if for some reason after year two, the sports authority said we cannot complete this renovation, yes, there was an indemnification up to that point in time, but not for the entire tax credits. I mean, for anything, let's put it this way, for any amount of money that they put in, they were guaranteed were they not to get that amount of money back out if the renovation failed. That's correct. Okay, so then I'm puzzled by your assertion that there's economic risk here. If I put $15 million on the table and the person across the table says, you're going to get that $15 million back no matter what, that's not all they put into the transaction forward anymore. They wanted more. They wanted preferred return. They wanted cash flow from the investment. The reason they would not receive that. The preferred return was assured as well. No, no, that was not. They had a right to the preferred return. That was not guaranteed. That was not guaranteed. There wasn't a policy put in place that would specifically ensure that there was going to be money to pay that? No. Yes, there was a policy put in place, the guaranteed investment contract. Correct. So isn't that, if you were guaranteed, meaning guaranteed investment contract, it means you're going to get that money. If the renovation failed, I agree, and the put or the call was exercised, there was money set aside to cover the preferred return. But once again, that's not what I think he goes into. They did not go into it just to get preferred return. They had much more expectations. They went into it to get the tax credit. That was one of the factors, but that's what Congress said to do when they enacted the rehabilitation tax credit, is that they encouraged private investors to enter into these transactions to get the tax credit. Judge Jordan has a question. Yeah. Let's see. Help me out with this. The project was fully funded before Pitney Bowes showed up, right? Not fully funded, no. It was a bond offering, and then there was money coming from third-party sources, and then it was not fully funded at the time Pitney Bowes showed up. In the offering circular, I thought it made it clear that this was the NGSEA had funded this project. And, in fact, there was this FASB ruling by the accountants, Lesnick folks. I realize it's a different issue, but doesn't it go to the same thing? The Lesnick people were assured that they could handle this FASB 144 issue because the state of New Jersey was behind this, and no matter what, this project was getting funded. Right. That was after the fact. That came in much later in the transaction. That was not really close, that FASB issue. That was much later on. But they accurately described the assertions that were made, that this is the state of New Jersey standing behind this. If Pitney Bowes did not have $20 million into this deal, it would have cost the state of New Jersey $20 million more. Sure. Nobody's suggesting that Pitney Bowes didn't bring money to the table. The question is, did they invest in this, right? Because that's what your folks from the government are saying, is that this isn't a genuine investment. There's a whole lot of paper here, lots and lots of lawyers and accountants and advisors, but at the end of the day, no matter how many reams of paper get put on the table, this is all about selling historic renovation tax credits and nothing more than that because there's no real investment. I apologize if I'm going about this in a roundabout way, but I realize the FASB thing came later in time. It seems to be pushing it the same direction that Counsel for the Government was pushing, and that is nobody understood this to be money needed to fund the exercise that was going on because it was fully funded before Pitney Bowes ever showed up. There was a $50 million bond offering. There was $20 million from a second source, and there was approximately $20 million for Pitney Bowes. So that was $90 million to have the entire renovations cost about $100 million. So there were those two sources. I don't disagree with that. But once again, they made a real economic investment in this partnership. Yeah, but did it have any risk? Excuse me. A partnership involves risk, right? Yes. And the question is, what was the risk to Pitney Bowes? A partnership, that is one of the factors if you look at it in a partnership. That is not the only factor in a partnership. It's an important one. I understand your honest question. But there was, once again, there was a risk that Pitney Bowes putting in $20 million and not having a successful completion of the renovation. What the government does in its argument, I think it has a surface appeal, but I don't think it has substance. It says because Pitney Bowes negotiated heartily, and they negotiated firmly, and got reductions in certain risk factors, that that algorithm is all risk. What was the risk? That's what we keep trying to get at. What's the downside? So far what you've said is they might not get the historic renovation tax credits they wanted, but what's the downside risk they ever had going into this? There was no, the QREs were already generated in large respect when they showed up. I mean, there's a bunch of them that were already on the table. There was no project risk because it was fully funded. At least the government says that. And as I'll repeat, there was this night, there's this offering circuit that talks about it in terms of being a $90 million project, and then says, but with another $17 million or $18 million, we'll call it a $107 million project. So it sure looks like it's fully funded, and then there's no audit risk because they say to them, you know, you're identified. If the IRS comes in here and says no, you're getting it all back. So if all of those facts are accurate, where's your risk? Again, I don't deny that those factors minimize risk, but that does not mean a partnership wasn't created. Just because you are wise enough in your negotiation and entry into the transaction to reduce your risk exposure, and that's what investors do. If someone in this partnership said, I'm going to put in $20 million, but I'm going to take 100% of the risk, who would ever do that? That's illogical. Because you're an investor member, you can be an investor without being an equity investor. I mean, that's the point. It sounds like people negotiate and protect themselves all kinds of ways, and they say, I'm not going to look for any upside, but I want a guaranteed return, and we call those people auditors, not equity auditors, not partners. So why shouldn't we look at you and say, at most, Pitney Bowes here, when you, you know what I'm saying, I apologize. I don't mean to be too informal, Mr. Flynn. But we look at Pitney Bowes and say, the best thing you've got going for you is maybe you're a creditor. Because a creditor has a guaranteed right to repayment of a sum certain on a date certain with interest. There is no guaranteed right to repayment of a sum certain here on a date certain with interest. And the government has not argued, by the way, that this was a debt equity situation. Sure, but it is approaching it, though. But there's no, what is no interest? 3% guaranteed return. 3% guaranteed, that's not guaranteed. It's a guaranteed investment contract. But it is not a guaranteed return. If the cash flow wasn't there, Pitney Bowes would not get it. They would only get it if they exercised a put or the call. And the record is clear. Neither party has exercised a put or the call. But they have that. See, when you say neither party did it, that's another example of no risk. Because if you can buy it back without regard to fair market value, you're not really talking about investment risk at all. You're just buying it. No, the put and the call, by the way, was fair market value. They were fair market value options. And they were only a floor. They were not a ceiling that Pitney Bowes was entitled to. If the real estate appreciated, if the investment appreciated, and the project was profitable, they had a lot more upside potential than the puts and the calls. I thought there was not just a put and a call, but there was this thing, what did you call it? Consent option. Consent option. It was not tied to fair market value at all. I heard a phrase in the last argument. Consent option was a black swan. It really was not what it purported to be. The testimony was clear from the trial that both parties agreed that the consent option was limited to the five-year recaption period and that it could only be exercised if the sports authority wanted to take some extraordinary action. For example, borrow funds from a partnership. If the sports authority wanted to do something extraordinary like that, which everyone thought was completely theoretical and would never happen, if Pitney Bowes did not get his consent, they could exercise the consent option. But if Pitney Bowes gave his consent, then the sports authority could not exercise the option. So it was not, as the government alleges, unlimited in time or unlimited in amount. And, obviously, both the lawyer for Pitney Bowes and the sports authority testify that they felt that there was some error in the drafting of that option because it was limited to the five-year recaption period. Is there any textual support for the proposition that the consent option had a time limit or that Pitney Bowes could prevent the authority from exercising the option? The text of it appears on the next page. What Judge Cokie found was that, yes, it was intended that it would only be during the five-year recaption period. And he appears to have, with all due respect, to have sort of conflated the put and call with the consent option because by its terms, looking at the actual documents, can you point us to text that says that that consent option is immune? I cannot point you to a text, but I can point you to a testimony that Mr. Counsel Lizer of the sports authority said. The lawyer for Pitney Bowes that was involved in the drafting said, we both understood that it was limited to the five-year recaption period. This thing was documented to the nth degree. If the documents don't say it, what difference does it make if after the fact, when they're trying to protect the deal, they come in and say, never mind what those things say, that they didn't intend that. I think it's important, Your Honor, because the testimony was clear on this, that the partnership meeting, when we looked at the put and the call, they were separate, standalone documents. This consent option, which I say is a red herring, was sort of buried in the partnership meeting, and it was clear from the testimony that someone dropped the ball in the drafting of that. Now, does it have the effect the government suggested? I believe it does not because if Pitney Bowes, excuse me, the sports authority sought to execute it, Pitney Bowes would sue it because there was never the intent of the parties that that consent option would be unlimited in time for exercise. Thank you. Thank you. Thank you, Mr. Farr. We'll hear from the government. Do you agree, by the way, that all these other things, notwithstanding, the real key to this is whether it was a partnership or not? Yes, absolutely. Because there's an awful lot of paper. But it still comes down to what one would say. Let me ask you this. What are advisors, speaking of lawyers, supposed to do? They've got a congressional direction. We want historic renovation to happen. We want to preserve our buildings. This is a good thing. We're going to give you tax incentives to do it. Go out there and knock yourselves out because we want to keep these buildings up and we don't want them knocked down. And yet the IRS gives no guidance at all as to how to manage this. And so when people enter into a transaction and they sensibly and understandably try to limit the risk associated with it, the IRS comes in and says, well, you don't get it. You just don't get it now because you've limited your risk too much. I mean, is that really a fair position to put businesses and state and local governments into when they try to form partnerships for the purpose of doing something Congress wants done? I think it is because what Congress wanted was equity investments in rehabilitation projects. How are you going to have an upside potential if you're a true partner? You're not going to have a 3% return that is funded out of part of your own capital contribution that goes to a guaranteed investment contract signed to pay off with a 3% return. And you guys say that's de minimis and it's not a real risk, but my question to you is who's to know when they've crossed the de minimis threshold and they're going to get what they're actually bargaining for? Nobody's suggesting that people here aren't bargaining to get advantage of tax credits. They are. Everybody knows that. Congress wants it to happen. That's why tax collectors are paying a lot of money to draw a distinction between what's to say that hogs get slaughtered and pigs or something. The point being is it's a difficult line to draw. And if the government's not willing to come in and give some guidance, as it does on so many things, why should the ax fall here? Well, I think this particular case is particularly egregious. And I think the number one thing is this guaranteed investment contract. I mean, come on. They took $3.3 million of capital contributions that went directly to a guaranteed investment contract signed to pay off the 3% return. That is not an equity interest. And, you know, a high-priced tax lawyer is supposed to know that. Your time is not up. There's something wrong with that red line. Okay. Well, one thing I was going to point out, a question about whether this was fully funded. On page 1714 of the appendix, this is an annual report of the sports authority, the third paragraph at the bottom talks about the authority has entered into agreements with the Casino Reinvestment Development Authority, whereby CRDA has agreed to reimburse the authority up to $3 million for certain pre-designed services and all costs in excess of bond proceeds for the project. What page is that again? 1714. I believe in our opening brief, I miscited to 1713. The reply brief has been corrected back to 1714. We don't decapitate people. I'm sorry. Read it. Okay. It's not a terrible mistake. So, you know, again, I'm sorry. The authority was not looking for an outside investor. What was the authority looking for? I'm sorry? What was the authority looking for? Well, they had a tax credit broker come in and say, hey, I can put some cash in your pocket because you can't use these tax credits. I've got these corporate investors lined up who will bid for it. So, you know. Back and cross you've done. Exactly. Thank you. I ask that the court reverse the tax court and demand for consideration of applicability of accuracy-related penalties. Yeah, because there are still issues. If you're correct, there is. Right. If we prevail, the IRS assorted accuracy-related penalties, which, of course, the tax court did not reach because it helped for the court. So you'd better remand if we took that into consideration. Got you. Thank you. That's good. Thank you, gentlemen. We'll take this matter under advisement.